# JOSIAH DUNNING
## *v.*
# MARTIN BATHRICK.

1. CHANCERY—*will not participate in a transaction where both parties have
acted fraudulently.*   A court of chancery will not lend its aid to either party to
a suit which has arisen out of an attempt on the part of both to defraud
another out of his property.

2. PRACTICE IN THE SUPREME COURT —*modifying the judgment of a pre-
vious term—reopening a case for new proofs.*   The Supreme Court will not
modify its decree of a former term, reversing the decree of the court below in
a chancery cause, and dismissing the bill, so as to remand the cause to let
in additional proofs.

3. SAME—*protection of intervening rights, acquired under a decision which was
subsequently recalled.*   Upon bill filed respecting the title to land, which was in
possession of the defendant, a decree was pronounced in the court below in
favor of the complainant, and directing the defendant to yield the possession
to him ; and, on appeal from that decree by the defendant, it was affirmed.
Subsequently, the order affirming was set aside, and a decree entered, revers-

ing the decree of the court below, and dismissing the bill. At a subsequent term, upon its being made known to the court that innocent parties had purchased the land from the complainant after the order affirming was made, and before it was set aside, the decree of reversal was modified, for the protection of those innocent parties, so as to dismiss the bill without prejudice.

4. SAME — *of restoring a party to his possession, of which he was deprived under a judgment which was afterward set aside.* Under the order affirming, the court below executed its decree by putting the complainant in possession of the land; but this court finally reversed the decree below, and dismissed the bill, because it appeared neither party had any right, and both were seeking to defraud a third party out of the land, and refused to order restitution of the premises to the defendant, or to remand the cause with directions to the court below to enter such an order.

APPEAL from the Circuit Court of De Kalb county; the Hon. T. D. MURPHY, Judge, presiding.

THIS was a suit in chancery instituted in the court below, by Martin Bathrick against Josiah Dunning and others. A decree was rendered in favor of the complainant, from which the defendant, Dunning, took this appeal.

The opinion of the court states the case.

Messrs. PLATO & SMITH and Messrs. LELAND & BLANCHARD, for the appellant.

Mr. T. LYLE DICKEY, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was a bill in chancery in the De Kalb Circuit Court, at the November Term, 1857, by Bathrick against Dunning and others, alleging that one Fuller Darling, in March, 1850, was the owner of south-west of south-west quarter of section 24, the south-east quarter and the east half of the south-west quarter of section 25, all in town thirty-eight north, in range five, east of the third principal meridian, in De Kalb county, and then unimproved; that Darling went to California in 1850, expecting to return soon, but did not until 1857; that during his absence the defendant conspired with others to acquire the title

to these lands, and pretended that Mitchell was the agent of
Darling, and authorized to control the land as such agent; that
complainant had taken possession of the land in the name of
Darling, and for his benefit; that in 1855 defendant instituted
in Darling's name, an action of forcible entry and detainer
against complainant, to recover possession of the land. Judg-
ment was rendered against complainant, which, on appeal to
the Circuit Court, was, at October Term, 1856, affirmed. That
in 1853 the lands were sold for the taxes of 1852, to one James
H. Beveridge, from whom complainant bought the certificate
of purchase, and obtained in September, 1855, a deed therefor,
and paid the taxes thereon for several years, and up to the time
the sheriff sold the lands to Josiah Dunning, one of the defend-
ants, complainant all the time believing that Darling would
return and refund complainant all the money so advanced and
paid out as taxes, and took receipts for the taxes, which are set
out in full; that an attempt was made to redeem the lands by
some person unknown, and who had no authority, but believed
to be Hemenway, one of the defendants, and an entry was made
on the record of sales of lands for taxes, in the name of Fuller
Darling, and a certificate of redemption issued, dated Septem-
ber 24, 1855.

That, after the purchase of the certificate from Beveridge by
complainant, and before the action of forcible entry, on 27th
June, 1855, Hemenway, conspiring with Dunning to acquire
the title to these lands, went to Iowa, where Mitchell lived,
and got from him the patents for the lands which Darling had
left with Mitchell, which Hemenway brought back with him,
and also a writing, purporting to be a promissory note from
Darling to Mitchell, for four hundred and eighty dollars, with
a paper, purporting to be a power of attorney, accompanying
it, authorizing Mitchell to sell the land and to control it. That
Dunning and Hemenway then pretended they had bought the
land, and applied to complainant to buy the tax certificate, etc.
That Dunning, at that time, exhibited the note and power to
sell, to complainant, who remarked that he thought they were
not genuine, and Dunning replied, " they looked suspicious; "

that after this, complainant, for the purpose of saving himself harmless from loss by means of the moneys he had expended, and with a view of protecting the land from being taken away by means of these forged papers, took possession of one forty acre tract, and put up a shanty or small house on it, and put a tenant in it, which is the tract of land mentioned in the proceedings of forcible entry and detainer. Complainant did this under the belief that the question of the forgery of the power of attorney from Darling to Mitchell could and would be thus tested, and with the same belief took and prosecuted the appeal in the Circuit Court. Complainant charges that this promissory note and power of attorney were forgeries, neither having been executed by Darling, and that Hemenway, Mitchell and Dunning were cognizant of the fact before the action of forcible entry was instituted, and had notice thereof. Complainant charges, that neither of these defendants had any authority, written or verbal, from Darling to meddle with this land, or do any thing, during his absence, touching the possession of it, or with his business in any way, save that Darling gave to Mitchell his title deeds, with a request to get them recorded, and that defendants were well aware that Mitchell had no such agency; and that Hemenway and Dunning were so well satisfied that the power of attorney was a forgery, that they could not be induced, during the trial of the suit of forcible entry, etc., to produce the papers, although repeated efforts were made by complainant and his counsel to that end, but in place thereof procured the affidavit of Mitchell, that he was Darling's agent to prosecute the suit.

That, while the action of forcible entry was pending, which defendants professed to carry on as the agents of Darling, but which really was carried on for the fraudulent purpose of defrauding Darling, and preventing complainant from protecting Darling's interest against their fraudulent practices, while Darling was absent in California, and in ignorance of these doings, Hemenway and Dunning, conspiring with Mitchell to cheat Darling, and deprive him of these lands, instituted on the 12th of January, 1856, in the Circuit Court of De Kalb

county, a suit by attachment in the name of Mitchell, and against Darling, whose agents they professed to be in the forcible entry suit, and affidavit of Hemenway and bond being filed, a writ of attachment was issued, and returned February 2, 1856, as having been levied on this land, January 21, 1856; a declaration with a copy of the note and an account was filed March 26, 1858 ; that some attorney, without any authority from Darling, entered a motion to dismiss the suit, which, by leave of the court, was subsequently withdrawn. Proof of service by publication was made, and a judgment for default of plea was entered, and a writ of inquiry of damages awarded; jury assessed the damages at seven hundred and forty-one $\frac{66}{100}$ dollars, being the amount of the note and interest, and items of an account against Darling, for which judgment was rendered. A special execution issued on this judgment, April 25, 1856, and a sale made of this land to Dunning, on the 30th of May, 1856, as assignee of Mitchell, the plaintiff in the attachment suit. That Dunning paid no money, but produced to the sheriff an assignment of the judgment from Mitchell to him, dated January 16, 1856 ; that the sheriff executed a deed to Dunning the fifth of October, 1857, and that Hemenway and Dunning have since taken possession of the land by themselves and tenants, and still hold the same. That in August, 1857, Darling, at Sacramento, California, for the consideration of fifteen hundred dollars, to be paid when Darling should return to this State, executed a deed, through the agency of one Henry Starr, an attorney there, to complainant, and mailed it to him, but which deed was lost on the 10th of September, 1857, at the time the steamship " Central America " was lost, it being in the mail carried by that vessel.

The bill then alleges, that " on or about the 14th of October, 1857, Darling returned to this State and informed complainant of the agreement made with Starr, in California, for the sale of his land to complainant, and the conveyance thereof, and that the deed of conveyance had been mailed to complainant, and that it had probably been lost on board the Central

America. That Darling on his return to this State was in very poor health, so much so as to be unable to perform a single day's labor of any kind, indeed so feeble and prostrate had he become from long and continued poor health, that he and his friends entertained little hope of his ever so far recovering his health as to be able to perform any labor even of the lightest description, and complainant was informed, that, for a long time before his return to this State, in consequence of long continued ill health, he had been unable to earn any thing by means of his own labor, for his support and maintenance, and in consequence thereof, he was, at the time of his return as aforesaid, wholly destitute of the means of supporting himself, save only his interest in the land, and was absolutely destitute of necessary suitable and comfortable clothing for a person in his situation, and no means with which to purchase even the most trifling article of clothing, or even a meal of victuals.

Complainant further alleges, "that immediately on Darling's return to this State, and upon his informing complainant of the several matters aforesaid, complainant offered to convey to Darling all the interest which complainant had acquired in and to these lands by virtue of the tax deed, upon condition that he, Darling, would repay to your orator, or secure the repayment thereof, the moneys so advanced to his use as aforesaid; that Darling, though he acknowledged the justice of the demand of complainant to have those moneys refunded to him, and declared that he was well pleased with all complainant had done in the premises, and cheerfully and cordially assented and ratified all that complainant had done in the premises, assured complainant that he was entirely destitute of the means necessary to repay the means complainant had advanced as aforesaid, and of the means to support himself; that his health was such that he could not then, nor probably for a long time to come, take care of or cultivate the land, and that he preferred to keep and fulfill on his part, the agreement to sell the land to complainant, which he had made with Starr, as complainant's agent in California, and assured complainant that the pretended claim of Dunning, Hemenway and Mitchell,

and their co-conspirators, was a fraud in fact from its inception. That complainant thereupon, upon the urgent solicitation of Darling, and for the purpose, as well of furnishing aid to him in his then destitute condition, as also of recovering the moneys so advanced by complainant, and also because of the acts of Starr, as the agent of complainant, in and about the purchase of these lands, consented and agreed to and with Darling, to keep, observe and perform on his part the contract for the purchase of the land; and Darling thereupon, on the 14th day of October, 1857, at Sycamore, in the county of De Kalb, made, executed and delivered to complainant, a deed of release and quitclaim, for all his lands in Illinois, described as follows: (The deed is made an exhibit, and are the same lands as above described in this opinion.) Complainant further alleges, that, upon receiving this deed, he executed and delivered to Darling his three promissory notes, bearing date October 14, 1857, payable as follows: One for the sum of two hundred dollars, payable October 1, 1859; one for three hundred dollars, payable October 1, 1860, and one for the sum of five hundred dollars, payable on the first day of October, 1861; making, in all, the sum of one thousand dollars; and for the remaining five hundred dollars, Darling accepted the verbal promise of complainant, to pay it to him " any time along," as Darling should need and demand it, but gave no note therefor, which sum of fifteen hundred dollars, was without deducting therefrom any thing, or any sum of money, for the moneys advanced by complainant to Darling or otherwise; and complainant avers, that it was then and there agreed, that the conveyance of these lands should be in full satisfaction of all demands for moneys advanced by complainant for Darling's use, and in full payment for the lands. Complainant insists, that all the proceedings of Dunning, and the others with him, were fraudulent and void; that when the attachment suit was commenced against Darling, he was really a resident of Illinois, though absent in California, intending to return, and therefore, the court had no jurisdiction; that Darling was not indebted to Mitchell, which Hemenway and Dunning well knew; that it was a fraudulent

transaction to acquire title; that the damages were assessed by a sheriff's jury, privately, to prevent exposure, and after they were assessed, they clandestinely took the note away, and never placed it on the files of the court, and afterward caused it to be destroyed, so that the forging thereof could not be proved; that Hemenway and Dunning, though interested in the attachment suit, were witnesses therein; that the signature to the Darling note was in the handwriting of Mitchell. An oath is waived to the answers; and the prayer of the bill is, that the note, the judgment thereon in the attachment suit, and execution issued thereon, the sheriff's sale and deed of the land, may be deemed to be null and void, and the defendants forever enjoined from setting up title to these lands, and for general relief.

The joint answer of the defendants was filed April 27, 1861, and purports to be made by Dunning, A. L. Hemenway, Wm. Hemenway and Southard and Reed, and a separate answer by Dunning alone.

The joint answer admits that Darling owned the land at the time, etc.; that he was not a resident of this State after he left it in 1850; insists that the note was genuine; Darling lived with Mitchell from 1847 to 1850, and then emigrated to California; that on the 2d of March, 1850, he settled with Mitchell, and executed his note for four hundred and eighty dollars, payable in two years, and also a writing, authorizing Mitchell to sell the land to pay this debt, when the note became due, and gave to Mitchell the patents, and authorized him to take possession and control the lands, occupy them, and pay the taxes, etc.; that Darling has never returned; has not paid the note, and has never since exercised or claimed any control over, or paid any taxes on, the land; denies all conspiracy to cheat or defraud Darling, but alleges that complainant for ten years has labored to cheat and defraud Darling out of these lands; that complainant never had any authority in the premises; that after Darling went to California, and Mitchell moved to Iowa, complainant came to this State and occupied lands adjoining Darling's land; that Darling's lands were first assessed for taxation in 1852, and complainant tried

to get a tax title on them; that in May, 1855, Mitchell, learn-
ing that the land was sold for taxes, and that complainant was
endeavoring to get a tax title, appointed defendant Hemenway
to take possession of the lands, redeem them from the tax sale,
and take a general agency, and gave to Hemenway the patents,
which Hemenway at once did; that complainant then paid the
taxes on May 14, 1855, took possession and put up a shanty on
part of the land; that Hemenway then commenced against
complainant, the action of forcible entry, June 27, 1855, and
obtained judgment, which, on appeal to the Circuit Court, was
affirmed against complainant; that complainant, in that suit,
made an affidavit that Darling was a non-resident of this
State; that the lands were properly redeemed by Hemenway
for Darling; that complainant obtained of the sheriff a tax
deed for the land by falsehood, and misrepresentation, and
that complainant had applied to the County Court for letters
of administration on Darling's estate, while the forcible entry
suit was pending; that Hemenway leased the lands to Dun-
ning for ten years, and put him in possession, which he has
ever since continued, and has made improvements of the value
of two thousand dollars, and paid the taxes. Admit the pro-
ceedings in the attachment suit, and insist every thing was fair
and regular, that Mitchell, having no advices from Darling
during his absence, deemed it prudent to sue to save his debt,
and no demands were presented to the jury but what were
strictly just; that, in January, 1856, Dunning, at the request
of Hemenway, went to Iowa to see Mitchell to get instructions,
evidence and means to conduct the attachment suit, and
Mitchell, being in poor health, in indigent circumstances, and
unable to prosecute his suit, sold and assigned to Dunning all
his demands against Darling which had been sued on, and
authorized him to prosecute the same to judgment for his own
use, and also made a quitclaim deed of the lands to Dunning;
that Dunning then paid Mitchell in cash the amount of his
demands, including the note; they deny that they refused to
exhibit the note when requested by any person having any
interest in it. Dunning purchased the lands on this judgment

28—41ST ILL.

in attachment, and the interest of the other defendants is only that of tenants of Dunning; that complainant sent his son-in-law to California to deceive Darling into some negotiation, thereby to get color of title, and, if he obtained a deed, it was by fraud and without consideration, and a conspiracy with Darling to cheat Dunning, they, knowing at the time that Dunning was in possession of the land, and had been in possession a long time; deny all fraud.

Dunning, in his separate answer, says, that, provious to the suit of forcible entry, he never knew or heard of Darling or complainant; that, being present at the trial, he became convinced of complainant's rascality; that he signed the attachment bond at the request of Hemenway, agent for Mitchell; he paid to Mitchell the amount of his demand, and took an assignment himself, which was the beginning of his interest in the matter. And he insists that the Darling who made the deed to complainant, was an impostor.

Replications were put in to the answers, and the cause was heard on the bill, answers, replications, exhibits and proofs, both documentary and oral, and are very voluminous.

We do not propose to go into the proof very minutely, but to state briefly the impression it has made on our minds. We have been particular in stating the allegations in the bill of complaint and in the answers, in order to present a full and distinct idea of the character of the controversy, which seems to us one having slight claims to the favorable consideration of a court of equity, and cannot be sustained, for complainant's benefit, on any well defined principle acknowledged in that court.

In the first place, the proof shows most clearly, when complainant came to De Kalb county, and settled on land adjoining the lands in controversy, Darling was then absent in California, and wholly unknown to complainant,— they were strangers to each other.

We see complainant, in 1853, purchasing from Beveridge a certificate of the sale of these lands for the taxes of 1852, and he produces the collector's receipt for the taxes of 1853, as paid by

Beveridge for Darling. The taxes for the subsequent years purport, by the receipts, to have been paid by complainant in his *own right*, and not as the agent or the benevolent friend of a man he never saw, then absent in California. That this was done for the purpose of getting a tax title on the land, to place him in a situation where he could show color of title in himself, there cannot be the slightest doubt, else why take the receipts for the taxes in his own name, and why obtain a deed from the sheriff under this purchase for taxes, if not to procure such color? It is so unusual for a man to pay the taxes due on the land of a stranger, merely for the benefit and accommodation of the stranger, that it may be safely asserted it has never been done, and never will be done, without some sinister and interested motive on the part of the person thus paying. It cannot be believed, for one single moment, that complainant did these acts as the kind and disinterested friend of a man he never saw, but for the plainly developed purpose of appropriating these lands to himself under a tax title. The complainant evidently sought this advantage over Darling, and no motives of friendship can be supposed to have actuated him to meddle with these lands, but his inspiration was a hope of gain. The absent Darling, and his interests, were as far from the consideration and view of complainant in this matter, as the distance of half the continent by which they were separated.

The complainant does worse. After procuring a tax deed from the sheriff, he took possession of one of the tracts, erected a shanty on it and put a tenant in it, intending to profit by the limitation act, making color of title, possession and payment of the taxes for seven successive years, a bar to any recovery in ejectment by the true owner or holder of the paramount title. And this, he says, was for the benefit of Darling, a man whom he knew not, and for whom he could have no sympathy. Away with such benevolence, that seeks, under its captivating guise, to despoil a man of his property. But the complainant was watched in all these his movements, by other parties, the defendants here, or a part of them, Dunning and Hemenway, who desired to appropriate to themselves this same property,

*per fas aut nefas.* They were as unscrupulous and avaricious as the complainant himself, and to balk him and get the land was their great object. Accordingly, they make an attack upon complainant's entry into the land, by the writ of forcible entry in Darling's name, and by the judgment of the magistrate who tried the cause, and by the Circuit Court which retried it on appeal, complainant was defeated; he was adjudged to have entered without authority, and was expelled from the land. A feature in this part of the case was, that the land had been redeemed in 1855, from the sale to Beveridge, under which complainant had obtained, by some means, a deed from the sheriff, and thus got possession.

This was the first act in the drama. The second opens by disclosing active operations by Hemenway and Dunning and Mitchell, ostensibly to obtain these lands for themselves, and to carry out their design. Learning that Darling, when he departed for California, had left the patents for these lands with his old friend, Mitchell, with whom he had lived for a year or more prior to his departure, Hemenway goes to Mitchell in Iowa, to which State he had removed, and returns with a note, purporting to be signed by Darling, to Mitchell, for four hundred and eighty dollars, and with a paper purporting to be a power of attorney from Darling to Mitchell, to control and sell the lands, and also with the veritable patents for the lands issued to Darling. Then Dunning gives out, and Hemenway too, that they had bought the land, and applied to complainant to buy his tax certificate, and Dunning exhibited to him the note and power of attorney, and both seemed to think they were suspicious looking papers.

Notwithstanding the bad appearance of these papers, palpable forgeries no doubt, an attachment suit was brought in the name of Mitchell, against Darling, in the Circuit Court, on this note, and an account, on the 12th January, 1856. The affidavit in the attachment was made by Hemenway, as agent of Mitchell, and the bond executed by him, with Dunning as surety. The writ of attachment was levied on these lands, a declaration filed. Publication of notice to Darling, of the pendency of

the suit was made in a county newspaper. Some attorney, it is said, without authority, appeared for Darling, and entered a motion to dismiss the suit, but afterward repented, and, by leave of the court, withdrew the motion. A default was taken against Darling, and the damages assessed by a sheriff's jury, before whom was presented the note and the account proved by these *disinterested* men, Dunning and Hemenway. It is surely no cause of complaint, that the parties engaged in this scheme did not choose to show this note to Darling's friends, though they were willing to exhibit it to any one who had any interest in the matter. It was not incumbent on them, or either of them, to take the note and exhibit it in the court yard, and call upon the bystanders to inspect it and pass their opinions upon its genuineness. This is never done. But where was this complainant all this time, while these nefarious proceedings, as he terms them, were going on against his distant friend, for whom he had bought a tax title against his land, received a sheriff's deed, took possession and sought to get a title in bar of this friend, by possession and payment of taxes? He was perfectly cognizant of all these doings, and all this wickedness, yet he makes no effort to stop the one or expose the other. His benevolence and friendship for the absent Darling, whom he had endeavored to injure, vanished, and he had not the heart to employ a lawyer to expose the swindle, and denounce the forgery, or even to suggest to the court, as *amicus curiæ*, that such they were. No, it would not have suited his purposes so to have done, and would have interfered with a plan he had then, apparently, concocted, to send to California for a deed, which he could the more easily obtain, if he could show the owner that the matter was so complicated by the sale for taxes, by this judgment, and a probable sale under it, all incumbering the lands, that he could get them for a song, and without paying any money for them.

Accordingly, we see, that, in the following year (1857), complainant sent his son-in-law, one Wesley Munger, to California, to find this friend Darling, for whom complainant, without his knowledge or request, had generously advanced so much money,

stated in the bill of complaint at about $1,000, being the
moneys, and those only, which complainant had expended in
buying a tax title against his friend Darling, paying the
subsequent taxes in his, complainant's own name, as the tax
receipts show, taking a sheriff's deed therefor, entering into
possession of the land, building a shanty on it, and resisting
the action of forcible entry, brought in Darling's name against
him, in which complainant was mulcted in the costs, both
before the magistrate and in the Circuit Court. It is incredi-
ble, that all these should amount to the sum of $1,000, or even
one-tenth part of that sum, and it is the perfection of impu-
dence, to make them a charge against his friend Darling, whom
he was trying to plunder. These moneys were no claim
against Darling, but the voluntary contribution by complain-
ant to effect his *friendly* purpose of benefiting Darling by depriv-
ing him of his land, in which he was foiled by the ingenuity
and contrivances of the defendants in this suit.

By the letter which complainant wrote to Starr, the Califor-
nia agent, and which was borne to him by Munger, complain-
ant's son-in-law, he was instructed to say to Darling, if such a
man could be found, that Mitchell had brought a suit against
him after he had left this State, and had recovered a judgment,
had levied upon his land, and had sold it, and that the writer,
complainant, did not believe that Darling was owing Mitchell
when he left, that the writer, this complainant, had paid the
taxes on the lands for Darling, had had a lawsuit concerning
the lands, had expended time and money to try and save the
land, to the amount of nine or eleven hundred dollars, and if
the writer, this complainant, could procure the title from Dar-
ling, he thought he could save himself, and something over for
Darling, but as matters then stood Darling would get nothing,
and he, this complainant, would lose all this money and time.

Impressed by this recital of his own wrongs, and complain-
ant's kindness toward him, Darling, denying that he owed
Mitchell one dime, but that Mitchell owed him the amount of
certain notes, which he then "conveyed to complainant," and
protesting that the suit brought by Mitchell was a fraudulent

transaction on Mitchell's part, Darling was willing to make the " deeds " to complainant, and did so, remarking that he did not know the value of the lands, as he had been absent for some time from this State, when the son-in-law, Munger, who was present all the time, remarked that these lands, or lands in that vicinity, were worth about five dollars per acre; Starr thinks that was the consideration expressed in the deed; that Munger was lost on his return to Illinois in the steamship " Central America," and supposes he had funds which were lost with him. Not one cent was paid to Darling for this conveyance, and not " the scratch of a pen," acknowledging any indebtedness by complainant, or his agent, for these lands. It appears also, that Starr had no personal acquaintance with Darling, who, as he says, was a man of light complexion, about five feet ten inches in height, and of spare habit, and who was, unquestionably, brought to him by the son-in-law, Munger, as the real Darling and owner of these lands, but whether he was or not, Starr did not know. Nor had Starr any personal acquaintance with complainant, the letter of August, 1857, borne by Munger, being the first knowledge he had of the existence of such a man as complainant. This Darling, Starr says, had been in California, as he himself stated, since 1849, and lived in Placer county, but had resided elsewhere in that State, and had lived in Illinois in the vicinity of his lands. Thus is seen the reason why complainant did not endeavor to expose the roguery of these defendants, in their efforts to get these lands by the attachment suit, as the proceedings under it complicated the case very much, and added to the tax title, which complainant instructed Starr to say to Darling had been obtained against the land, and the large amount of moneys complainant alleged he had expended to save the lands, all which statements were false and known to be so, enabled complainant to get the wished-for deed.

And here we may pause a single moment, to contemplate this transaction. A perfect stranger to Darling writes a letter to a lawyer he did not know, in Sacramento, California, which is borne by his son-in-law, instructing him what to say to Ful-

ler Darling, the owner of 280 acres of valuable land, in one of
the most flourishing counties in this State; these statements
of complainant in the letter, false as they all are, induced Dar-
ling to execute a conveyance of the land to complainant, with-
out taking any note for the consideration money, and without
any knowledge of the value of the land. Men do not often act
in this manner; indeed, it may be safely said, that men who
are strangers to one another never do, and never did, import-
ant business of this character in this manner, and no satisfac-
tory reason is shown why Darling so acted on this occasion.
On the contrary, the strongest possible reason is shown why
he should not so have acted, he having declared his intention
to· return to this State in a short time, and actually returning,
if the proof is to be credited, in less than two months there-
after. Now, is it not unaccountable, that the owner of·so much
valuable lands, about to return to the place where they are
situate, should, in advance of such return, send a deed for them
to a perfect stranger, without taking a note for the purchase-
money, and without the payment of a dollar, and accept the
valuation made by the purchaser's son-in-law as the true valua-
tion, when he could see the land with his own eyes in a few
short weeks, and determine for himself the value, and the more
especially as want of money did not compel a sale? And what
is stranger still, that this deed should be put in the post-office,
to be sent by mail, when complainant's own embassador was
present, ready to receive it and deliver it to the complainant!
The whole thing is incredible, and we are not convinced of
the purity of the transaction, by reason of the false statements
contained in complainant's letter to Starr on which we have
commented, and which, no doubt, caused Darling to execute
the deed.

But there is another thing to be observed. In this trade, it
was distinctly understood that Darling still retained an interest
in the proceeds of these lands, if there should be a residuum
after compensating complainant for his heavy outlays, amount-
ing to nine or eleven hundred dollars, but which, in reality,
amounted to a very small sum, namely: for taxes, including

those paid by Beveridge, thirty-two dollars and ten cents. This is shown by complainant's own exhibits. The charge for defending the forcible entry suit against Darling himself was a false and fraudulent claim, the offspring of those machinations through which complainant sought to deprive Darling of his land, and, if successful, by the lapse of seven years, and paying the taxes, he could have set Darling at defiance, which it is very evident it was his intention to do. Here, then, is shown falsehood, deceit and misrepresentation of the most aggravated character, out of which no good claim can arise to demand the aid of a court of equity. Equity delights not in iniquity, but repels from her embrace all who practice it.

Let us now consider what transpired on Darling's return to this State. On the 19th of August, 1857, he made the deed to complainant, under the circumstances stated by Starr. On the 14th of October of the same year, Darling returned to De Kalb county, and on that day he executed another deed to complainant. We will take the sworn statement of complainant of this transaction, by which he must stand or fall.

From this statement the first information complainant received of the California transaction was from Darling himself, on his re-appearance on the 14th of October, 1857, that a deed had been mailed to be sent on the Central America, and was probably lost on her. At this time, Darling was in very poor health, not able to perform a day's labor of any kind, and no hope that he ever would be able, and was then wholly destitute of the means of supporting himself, save only his interest in these lands, and was absolutely destitute of suitable, necessary and comfortable clothing for a person in his situation, and no means with which to purchase even the most trifling article of clothing, or even " a meal of victuals !"

Observe now the generosity, the loving kindness, philanthropy and benevolence of this good Samaritan, the complainant herein ! On Darling's information, that he had made a deed to complainant, in California, complainant, on the instant, struck, no doubt, by this extraordinary mark of confidence reposed in him by Darling, offered to convey to Darling all

the interest complainant had acquired to the land by virtue of the tax deed, *upon condition*, that he, Darling, would repay to him, or secure the repayment thereof, the moneys so advanced for his use as aforesaid, referring to the "nine or eleven hundred dollars," he had falsely asserted he had paid out for Darling. Poor Darling acknowledged the justice of the demand, and was delighted with all complainant had done in the premises, and cheerfully and cordially assented to, and ratified all that complainant had done, but assured complainant that he was entirely destitute of means necessary to repay him his advances, and of the means to support himself, and his health was so bad that he preferred to keep and fulfill the agreement made in California to sell the lands. Complainant here swears that it was an agreement made in California to sell the lands, not a sale and conveyance by deed. But let that pass, and consider the kindness of complainant, and his tenderness toward poor Darling. He finds Darling in his own neighborhood, after an absence of seven years, poor in health, and so destitute of means, as not to be able "to buy an article of suitable clothing for him, or even to buy a meal of victuals." In this condition the complainant now offers to surrender to him all the interest complainant had acquired in this land, on condition that this poor, sick, penniless man, who could not buy "a meal of victuals," should repay him, or secure the payment of about one thousand dollars in cash — gold at that time, when, at the very time Darling did not owe complainant one dollar, and complainant well knew it.

But see further. Darling, persisting in his desire to carry out the California contract, this humane complainant, ever alive to the most honorable and kindest dictates, "upon the urgent solicitation of Darling, and for the purpose, as well of furnishing aid to him in his then destitute condition," as also of recovering this false and fabricated amount against Darling, and also because of the acts of his agent, Starr, consented to perform, on his part, the contract so made with Starr, whereupon Darling made the deed of October 14, 1857. And how was "aid furnished Darling in his then destitute condition," which

to furnish, was one of the causes operating with complainant to take the deed. What was his condition? He had no decent clothes to his back or limbs; he could not buy a meal of victuals; and to relieve him in his extremity, complainant executes three notes to him, *on long time.* The one for two hundred dollars and first due, having nearly two years to run, and the others three and four years respectively, or nearly so; and for the remainder, being five hundred dollars, Darling had not the "scratch of a pen," and agreed to receive it "any time along," as he might need it. Could poor humanity be in more pressing "need," than this man, Darling, was at this critical moment, with scanty clothes to his back, with nothing to eat, and no means of procuring clothing or food, and yet we do not see complainant ministering to his wants, feeding and clothing him, or giving him money enough to buy a meal of victuals, while extracting from him a deed for 280 acres of valuable land, which would have been a permanent support for Darling during his life, should he live beyond the allotted age of man. It would have been food and clothing to him forever. Such hypocrisy, baseless pretensions and mock benevolence, cannot stand the test of the most ordinary scrutiny, and they place the complainant in a situation far from enviable. He never had any just claim whatever on Darling. He sought at the outset to get a tax title on this land, in defiance of Darling.

All his acts are marked by this one over-powering desire to obtain this land; and by fraud and misrepresentation he has got a deed for it. The defendants have a deed also, and are in possession. And though the proceedings under which they claim title may be denounced as having originated in forgery, and carried on by fraud, still, in such a contest, where there is knavery on both sides, which shall this court aid?

Here was a contest, who should steal this land. The complainant approaches a court of equity, holding in his hand evidence of his attempt to get this land from Darling, by a purchase for taxes, and the deed Darling executed, for which he has never received a dollar. Here, then, is no remarkable equity on complainant's part, by his own showing.

The defendants' case seems to us to be full of fraud of the blackest dye, and can find no favor with this court. Which of these parties, both with unclean hands, should a court of equity assist? Justice, and those pure principles which are the ornament of such a court — its brightest jewels — answer, neither.

We cite no authorities in support of the conclusion we have reached. Books need not be searched for precedent. It is found inborn, innate in every bosom. Where both parties seek a right through fraudulent devices and pretenses, neither party can have the aid of a court of equity.

On a bill filed by the heirs at law of Darling, no obstacle appears to their recovery.

The court below should have dismissed this bill on the hearing, for want of such equity on the part of complainant to entitle him to the relief he seeks.

The decree is reversed and the bill dismissed.

*Decree reversed.*

As before stated, the decree of the court below was in favor of the complainant, Bathrick, in which, among other things, it was decreed that the possession of the premises in controversy should be surrendered by Dunning to Bathrick. On Dunning's appeal from that decree, the cause was first argued in this court at the April Term, 1864, when an order was entered, affirming the decree of the court below. Subsequently, this court ordered a re-argument of the cause, which was had at the April Term, 1865, and the case was then taken under advisement.

On the 6th of October following, this court entered judgment, setting aside the former order of affirmance, and reversing the decree of the court below and dismissing the bill; and on the same day the foregoing opinion was filed.

In the mean time, on the 8th of June, 1864, a certified copy of the order affirming the decree was filed in the office of the clerk of the court below, and on the 6th of July following, under a writ of possession issued from the Circuit Court, upon

the decree, the sheriff turned Dunning out of possession and put Bathrick in.

On the 15th of September, 1864, Bathrick, being in possession, sold and conveyed the premises — a part to M. W. Foster, another parcel to J. Foster, and a forty acre tract to H. Beacham, for prices amounting in the aggregate to $6,000, each paying part down, the cash payments amounting to $2,500, and notes were given on time for the balance, which was $3,500. These notes were assigned before their maturity, by Bathrick to one Tappan.

At the time of the re-argument of the cause in this court, at the April Term, 1865, the fact of Bathrick being put in possession of the premises, under the authority of the Circuit Court, or of his sale and conveyance to third parties, was not known to this court nor to the counsel of either party.

At the April Term, 1866, the appellant, Dunning, filed his petition in this court, setting up the order of April Term, 1864, affirming the decree below, and the subsequent action of the court below in putting Bathrick in possession, and the judgment of reversal finally entered, and stating that he had applied, upon notice given, to the court below to be re-instated in his possession, and that his application was denied, upon the ground that the case was not before that court; and he prays this court to grant him relief, and for a writ to restore him to the possession of the premises, or that the cause be remanded with directions to the Circuit Court to re-instate him in possession.

Subsequently, and during the same term, Bathrick presented his affidavit to the court, in which he states, that, since the death of Fuller Darling, he has paid to his administrator the sum of $800, part of the last $1,000 of the purchase-money for said land, which was secured by note, and at the same time took up the old note, and for the balance and interest, gave a new note, with security — the amount being $320.90 — and that the note had become due, and had been sued upon, and he expected to be compelled to pay it.

Bathrick further states, that he did not deceive Darling as

to the facts of the case, in making the purchase of him, and that he is able, if allowed to do so, to prove beyond cavil, that, at the time Darling made his deed to affiant, he had full knowledge of the facts, and was fully advised of his legal rights, and acted freely and of his own will in doing so, and that no advantage was taken of him. He therefore asks, if another hearing is ordered, that the decree of the Circuit Court be affirmed; but if not, then that the case may be remanded to the Circuit Court, with leave to take proof on that branch of the case.

Bathrick resists the motion made by Dunning for a restoration of possession, on his own behalf, and on behalf of his grantees, who are innocent purchasers.

Messrs. LELAND & BLANCHARD, for the appellant.

Mr. T. LYLE DICKEY, for the appellee.

PER CURIAM: The questions involved in the motions submitted in this case are important, and their solution not free from difficulty. It is made to appear to us by affidavits that innocent parties have become interested in this controversy, and that, too, under a decision of this court, which was subsequently recalled. We are not disposed to allow either of the motions submitted, as allowing either might become a precedent attended with much embarrassment and injurious consequences in practice. We have, however, precedent and authority for modifying the decree of the last term, dismissing the bill. To protect such interests of innocent purchasers under Bathrick, the complainant in that bill, as they may show have become vested in them, we are inclined so far to modify the decree, as to order and decree that the bill be dismissed without prejudice, and the decree of last term will be so modified. In the state of facts presented by this record, we do not feel at liberty to order a restitution of the premises in favor of Dunning, who has been deprived of the possession, or to remand the cause, with directions to the court below to enter such an order.

*Decree modified.*