John A. Dickson and William P. Dunlap, Appellants, v. Roy D. Keehn, Appellee.

Gen. No. 33,947.

Opinion filed October 21, 1931.

CHURCH, MCMURDY, HARPEL & WAGNER, for appellants; ROBERT M. MCMURDY and HOWARD M. HARPEL, of counsel.

KIRKLAND, FLEMING, GREEN & MARTIN, for appellee; WEYMOUTH KIRKLAND, ALBERT FINK, HOWARD ELLIS and J. B. MARTINEAU, JR., of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

John A. Dickson and William P. Dunlap filed their bill of complaint in the superior court of Cook county seeking to dissolve an alleged agreement for a copartnership or joint venture entered into between the parties herein for the sale of adjacent properties located in the City of Chicago, and for an accounting alleged to be due thereunder. The chancellor dismissed the bill for want of equity, holding that the agreement was invalid on grounds of public policy because it violates the rule against perpetuities and in restraint of alienation. This appeal is prosecuted to reverse the decree entered.

The essential facts disclose that Dickson had since 1918 been employed by the Illinois Publishing and Printing Company as advertising manager, general manager and director at a salary of $26,000 a year. It was his duty to search for methods of advertising for the Chicago Herald Examiner, a newspaper printed and published by the Publishing Company. Shortly prior to August 19, 1920, Dickson observed a sign of the Piggly Wiggly Company on a building located on Michigan avenue, just north of the new Link Bridge,

and decided that the roof of that building would be an excellent location for a billboard to advertise the Company's newspaper.. He thereupon sent one Hartford, also an employee of the Publishing Company, to ascertain whether the Piggly Wiggly Company would lease space on its roof for a billboard advertising the Herald Examiner. Hartford, after making inquiry,' reported that they would not, but told Dickson that there was available roof space on a building about 100 feet north of the Piggly Wiggly property located on the southwest corner of Michigan avenue and Illinois street, owned by one Nelson Landon Hoyt.

With this information Dickson called upon Hoyt the same day to ascertain whether he would lease roof space for a billboard. Dickson was advised that Hoyt was agent for his wife for half of the property and trustee for his daughter for the other half. Dickson thereupon proposed that Hoyt lease billboard privileges on the roof of this building to the Herald Examiner, but Hoyt declined the proposal stating that he was committed to lease the whole property to the Bowes Realty Company, with whom he had promised to consummate a deal that very afternoon at four o'clock and that he had even signed the lease which had not yet been executed by Bowes Realty Company. It provided for a five-year term, the rent for the first year being $4,000 and the last four years $6,000 annually, together with an option to purchase the property at a price of $100,000 during the first three years and $110,000 for the last two years of the term.

The evidence discloses that Dickson's business experience enabled him to appreciate the value of that lease and option, and that he believed real estate values on the newly opened Michigan avenue would increase in the near future. It also appears that Dickson fully appreciated that the rental values stipulated in the lease between Hoyt and the Bowes Realty Com-

pany would make a very profitable investment as an advertising proposition for the Herald Examiner, and that the Hoyt property could be made to bring in a revenue upwards of $2,000 per month by erecting two overtowering signs on the roof of the building.

After interviewing Hoyt, Dickson returned to the offices of the Publishing Company and talked to Dunlap, co-complainant herein, about the matter. Dunlap had for some time prior thereto been the business manager, treasurer and custodian of the funds of the Publishing Company. His salary at the time was $12,000 per annum. Dickson told Dunlap about the terms of the Bowes lease and particularly of the option to purchase, and although the matter was not within the scope of Dunlap's employment, the two went together to view the property.

As they stood there looking at the building Dunlap remarked that the property "would be a very advantageous personal real estate proposition," and he testified upon the hearing that "it did not take him long to decide that it was a good opportunity for a personal investment." Dickson testified that he had not thought of this before Dunlap made the suggestion, but he instantaneously "agreed with him and we decided to take it if we could get it for ourselves."

It further appears from the evidence that Dickson and Dunlap immediately called on Hoyt, who had not yet delivered the signed lease and option to Bowes Realty Company, and suggested that Hoyt execute a similar lease and option with them personally. They proposed a contract with them personally under which the purchase price in the option be raised from $100,000 and $110,000 to $125,000 and $135,00, respectively. Hoyt, however, declined to make such a contract with complainants because, as he stated, he was not satisfied with their financial ability to carry out the agreement, and indicated that he would prefer

to do business with the Publishing Company. Complainants thereupon returned to their offices, and Dunlap drew a check of the Publishing Company for $4,000, payable to the order of Hoyt. Then they drew their personal checks for $2,000 each to the order of the Publishing Company to cover the $4,000 Company check, and returned to further negotiate with Hoyt. The latter evidently believed that he was dealing with the Publishing Company and observing the $4,000 check, accepted their proposal, executed a receipt and agreement to enter into a lease and accepted the $4,000 Publishing Company check as earnest money in payment of the first year's rental. The memorandum agreement was signed by Hoyt, as trustee, as agent and personally for his wife, daughter and son-in-law, and Dickson and Dunlap signed the agreement as officials of the Publishing Company.

On August 20, a form of lease was prepared. By its terms Hoyt leased the property to the Publishing Company, its successors and assigns, for five years commencing September 1, 1920. According to the evidence Dickson insisted on the lease running to "assigns" so that he and Dunlap could later get an assignment of it from the Company, but this plan was not disclosed to Hoyt. Under the terms of the lease the Publishing Company agreed to pay $4,000 for the first year's rent and $6,000 annually thereafter. Hoyt granted an option to the Publishing Company and its assigns to purchase the property at the price of $125,000 until September 1, 1923, and $135,000 from September 1, 1923 to September 1, 1925. The option was to be exercised by written notice to Hoyt. Of the purchase price $40,000 was to be paid in cash upon delivery of the deed and the balance was to be paid in four equal annual instalments.

It is conceded that during all of this time Dickson and Dunlap made no effort to get in touch with William Randolph Hearst, the owner of the Publishing

Company, although in a subsequent communication to Mr. Hearst, Dickson stated that he had tried in vain to get an option for a week until communication could be had with him.

The defendant, Roy D. Keehn, was president of the Publishing Company and personal representative of Mr. Hearst in Chicago. He was likewise the attorney for the Company and Hearst. On August 23, 1920, Dickson brought the executed lease from Hoyt, as trustee and agent, to the Publishing Company, to Keehn, and told him that the lease was being executed to obtain billboard space for the Herald Examiner. He did not, however, tell Keehn of the plan of Dickson and Dunlap to obtain the property for themselves, nor that he and Dunlap had given their personal checks for $2,000 each in exchange for the check of the Publishing Company drawn to the order of Hoyt. All that Dickson disclosed to Keehn was that he, as general manager and advertising manager for the Publishing Company, wanted Keehn, as attorney for the Company, to have the title assured and to place the entire transaction in legal shape for the Publishing Company, and he requested Keehn, as president, to sign the lease. Keehn, of course, knew that Dickson under the terms of his employment by Mr. Hearst was required to pass on advertising matters and at that time regarded the plan as nothing more than an acquisition of the leasehold by the Publishing Company of billboard space on behalf of the Herald Examiner. It is clear from the evidence at this time Dickson and Dunlap had definitely decided to obtain Hearst's consent to an assignment of the lease and option to themselves, if possible, but they made no mention of the plan to Keehn, with whose position and relationship to Hearst they were fully cognizant.

After examining the lease on behalf of the Publishing Company, Keehn, as its president and attorney, signed the same and returned it to Dickson. The

latter, however, did not deliver the lease to Hoyt for execution, but turned it over to Dunlap, who kept the document until after he procured Hearst's consent to an assignment thereof to them. During the interim of two and one-half months, pending the assignment, no advertising sign of the Herald Examiner was ever put on the property, presumably because, as Dickson testified, "there never was any reason why an advertisement of Herald Examiner should have been put on the property."

After the lease was executed by Keehn, Dickson and Dunlap together prepared a letter, signed by Dickson alone, addressed to Mr. Hearst, in California, as follows:

"September 2, 1920.

"Mr. W. R. Hearst,
San Simeon Ranch,
San Luis Obispo, Calif.
Dear Mr. Hearst:

"In looking for some locations for some printed signs recently, I ran across a piece of property on Michigan Avenue, just north of the new bridge, (a remnant of 25 feet left after widening the street), with 100 feet frontage on Michigan Blvd. The owner was not interested in leasing the sign privileges, but I found that the property itself was for lease or sale.

"It looked like such an excellent possibility for investment that Mr. Dunlap and I decided to lease it with the option of buying it within five years. We personally paid the first year's rent of $4,000. When we came to draw up the lease it developed that the owner assumed that we were acting for the Herald and Examiner, because, I suppose, my first inquiry was for a sign location for the Herald and Examiner. He prefers not to make the deal with Mr. Dunlap and me personally, and is entirely frank in stating that he considers the company a better credit risk than the individuals.

"We are very anxious to hold the lease because we think it is a good investment and because we know that an agent for a big estate is very anxious to get hold of the property. A lease for the property had been already signed to the Bowes Realty Co. but not delivered. We tried to get an option for a week until we could communicate with you. However, we could not obtain an option and had to act before five o'clock that day, or abandon the opportunity.

"Therefore, because it is an entirely profitable investment for the paper as a location for advertisements, we signed the contracts to lease it for the Company.

"Would you be willing to let us make this lease in the name of the Herald and Examiner and then have the company assign it to Mr. Dunlap and me? This would mean that you would be assuming the risk of our paying the rent for four years of the five year term, the first year's rent being already paid by us. The rental is $6,000 a year. I hope you believe that we can and will take care of this obligation.

"It is, as I said, an entirely profitable investment for the paper simply as a location for an advertisement. Of course, it would be a much more highly profitable investment from a real estate standpoint.

"In thinking over this request, it seems like rather a good bit of nerve, but I was anxious to keep the property from going to somebody else, and this seemed to be the only way to hold it.

"We would, of course, have Mr. Keehn examine the leases to assure you that there would be no further obligation against the Company than our making good on the rent.

"Will you let me know your decision?

Yours sincerely,

JAD-EOB.''

Shortly after receipt of this letter Hearst wired his approval of the assignment. Upon receipt thereof

Dickson procured the lease from Dunlap and took it to Keehn with Hearst's telegram. There is some conflict in the evidence as to whether Dickson at the same time showed Keehn a copy of his and Dunlap's letter to Hearst, but at any rate Keehn was requested in pursuance of Hearst's consent to the assignment of the lease to prepare the necessary resolutions to be signed by the directors of the Publishing Company authorizing the assignment. Keehn directed Edward G. Woods, who was associated with him as attorney for the Hearst Publications, to prepare the resolutions authorizing the transfer. Up to this time no mention had been made to Keehn of the value of the lease or the manner in which it had been procured.

Following this conference with Keehn the lease and option were delivered to the Hoyts for execution on their part, but no mention was made to Hoyt of arrangements for assigning the lease by the Publishing Company to Dickson and Dunlap.

Hearst ultimately signed the minutes prepared by Woods. Hoyt returned the lease and option duly executed, and on November 4, 1920, a formal assignment thereof to Dickson and Dunlap was executed by the Publishing Company, and thereafter recorded on November 6, 1920.

Having acquired the assignment of the lease to themselves Dickson and Dunlap began negotiations with the Standard Oil Company to lease the sign privileges, instead of the Herald Examiner. The evidence discloses that the Standard Oil Company submitted a design for a Red Crown sign, set in lights, for which Dickson and Dunlap demanded $2,000 a month for the rental of one sign. There was room for two illuminated signs 20 feet high by 50 feet long on the building in question, the aggregate rental for which was reasonably worth in excess of $24,000 a year. For reasons not disclosed in the record, negotiations with

the Standard Oil Company were abandoned, and in lieu thereof a three-year lease for sign space was made with the Cusack Company, at a rental aggregating $7,500, payable monthly, with a cancellation clause on 30 days' notice. A lease for like privileges was made with the American Bill Posting Company for $100 a month, the aggregate revenue from these two sources amounting to $8,750 per year, with provisions making possible the sale of the property at any time upon short notice.

The property thus acquired by Dickson and Dunlap had, as the result of the widening of Michigan avenue, been reduced to a depth of 25 feet with 100 foot frontage on Michigan avenue. Dickson and Dunlap procured the opinion of an architect to the effect that the limited depth of the property would not make it feasible for the erection of a building thereon which would yield sufficient revenue to warrant the investment necessary. About this time complainants learned that the adjoining lot, referred to in the record as the Blair lot, could be purchased for $80,000. The Blair lot fronted on Illinois street adjacent to and west of the Hoyt lot and was 50 x 100 feet in dimensions. The two lots together represented a frontage of 100 feet on Michigan avenue with a depth of 75 feet on Illinois street.

With a view to finding some one "friendly" who could furnish sufficient cash to acquire the Blair lot and thus combine the two properties so that they might be sold as one, Dickson approached Mr. Kobler, advertising manager of Hearst's American Weekly, who was regarded in the Hearst organization as one of its successful advertising representatives. Kobler, however, declined to enter into an arrangement with complainants. Dickson and Dunlap, according to their testimony, thereupon planned to approach Keehn for the purpose of interesting him in their plan. About

a week after the assignment of the lease and option Dunlap first solicited Keehn's opinion as to whether the Hoyt lot was of sufficient size to support a building capable of producing enough revenue to warrant the construction expense. He spoke to Keehn several times about the matter and as he testified, "in each of these talks I pointed out to him the advisibility of getting it (the Blair lot); I thought it would be a good thing for him. . . . I was trying to sell him on the proposition." Evidently Keehn did not at first look favorably upon the plan by which he would be required to furnish the capital and assume the risk for one-third of the profits offered him. Therefore, about two weeks after the matter was first taken up with Keehn, Dickson appeared in the latter's office and told him that Kobler, for whose business judgment Keehn evidently had considerable respect according to the evidence, had offered to purchase the Blair lot and contract with Dunlap and himself to hold the two as one property and divide the profits three ways in the event of a sale, but that he preferred to have Keehn rather than Kobler. It appears from the record that this statement was untrue. Nevertheless Keehn went with Dunlap and Dickson to see the property, became interested in the proposal to acquire the Blair lot and entered into an oral agreement with complainants, that the two lots were to be sold as one and the profits upon the sale to be divided three ways equally.

On February 21, 1921, Keehn purchased the Blair lot for $100,000, $20,000 of which was paid in cash and the balance to be paid $20,000 a year for four years, with interest at 6 per cent. Shortly after acquiring this property Keehn suggested that the contract between him and complainants be reduced to writing, to which all parties agreed. Charles Center Case, an attorney at the Chicago Bar, was then associated with Keehn in his law office as a member of

the legal staff of the Herald and Examiner. Dickson and Dunlap both testified that they had confidence in him. After numerous consultations with all the parties, but more particularly with Dunlap, Case drew a draft of the contract, and submitted copies thereof to Dickson and Dunlap which they took away with them, read over and then suggested several changes. The contract was finally executed by complainants and Keehn. The preamble of the agreement recites, in substance, that Keehn had purchased the Blair lot, the assignment of the lease between Hoyt and the Illinois Publishing and Printing Company to complainants, that the parties desired that Keehn should acquire the Blair property and Dunlap and Dickson acquire the Hoyt property, so that the two pieces might be sold as one at a profit to the parties to the agreement, and contains the covenants which are hereinafter fully set forth:

Paragraph 7.

"It is agreed that in order to sell the two properties, it will be necessary for Dickson and Dunlap to exercise the option to purchase the Hoyt property but it is the expectation of the parties that the advances which Dickson and Dunlap will be required to make in the exercising of the option will not be required to be made until at or about the time the aforesaid properties may be contracted to be sold and that Dickson and Dunlap may be speedily reimbursed for such advances from the proceeds of the sale pursuant to the provisions of paragraph 6."

Paragraph 8.

"The parties agree to promote the sale of the two properties in order that they may be disposed of expeditiously for the best possible price obtainable and at the most advantageous terms. The parties agree that they will, from time to time, give exclusive au-

thority to brokers to be selected, for a period of approximately 90 days.''

''At any time that any offer to purchase said property shall be received, same shall at once be submitted to each of the parties hereto, and whether any such offer shall be accepted shall rest in the discretion of a majority of said parties; provided, however, that if the majority of said parties shall not desire to accept any such offer, which may be acceptable to the other of said parties, then, unless said offer shall be accepted, the parties who shall not desire to accept same, shall forthwith pay to the other of said parties for all his right, title and interest in and to said properties and in and to and under this contract and in and to and under said lease and option to purchase such amount in cash as he would be entitled to receive under the provisions of paragraph 6 hereof, were such offer accepted and the contract thereby made, consummated.''

Paragraph 9.

''It is understood and agreed by and between the parties hereto that in the event that said Blair and Hoyt properties are not sold for the benefit of the parties hereto on or before the 20th day of August, A. D. 1925, and in the event that parties of the second and third parts have not before that time exercised the right and privilege of purchasing said Hoyt property, in accordance with the provisions of aforesaid lease and option to purchase, the said second and third parties shall forthwith sell, assign, transfer and convey to said party of the first part, all their right, title and interest in and to said lease and option to purchase, and in and to said Hoyt and Blair properties, upon the payment by said party of the first part to said parties of the second and third parts of One Hundred ($100) Dollars in cash, and without other consideration and thereupon this contract shall cease and be determined.''

. . . . . .

Paragraph 11.

''This contract shall be and remain in full force and effect from and after this date until it shall be terminated in accordance with the provisions of Paragraph 9 hereof, unless said properties shall be sold by the parties hereto and the contract executed accordingly prior to that time. In the event, however, that said Blair and Hoyt properties are not sold for the benefit of the parties hereto on or before August 20, 1925, then, if the parties of the second and third parts have before that time exercised the right and privilege of purchasing said Hoyt property, in accordance with the provisions of aforesaid lease and option to purchase, this contract shall be and remain in full force and effect until said Blair and Hoyt properties shall be sold and the proceeds of the sale thereof distributed in accordance with the provisions of Paragraph 6 hereof. During all of the time that this contract shall remain in force and effect as aforesaid the covenants, agreements and conditions of these presents shall be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns.''

The agreement bears date March 4, 1921. On the same day it was executed a brokerage contract for 90 days was granted to the Bowes Realty Company to sell the combined properties as one at a price averaging $60 per square foot, but no sale was consummated and the contract expired by its own limitations.

In January, 1922, the Tribune Company, which had set out to acquire the entire block, including the Blair and Hoyt lots, retained the real estate firm of Clark and Trainer to assemble the properties in the block. Milton Trainer of that firm procured Jarvis Hunt to act as a dummy purchaser for the Tribune Company so as to prevent a possible rise in prices that might

result if it were known that the Tribune desired these properties. The transaction was placed in the hands of William O. Trainer, who called on Keehn, inquired as to the price of his lot and the Hoyt property, and then learned from Keehn that the Publishing Company had assigned the lease and option to complainants. Trainer thereupon went to Dunlap and told him he was attempting to acquire the entire block. Dunlap apprised Trainer of the contract of March 4. Dunlap and Dickson then called on Keehn, and for the first time proposed a sale of the property to yield a profit of approximately $75,000 for each of the parties in the sale of the two lots, fixing a total purchase price on the property of $450,000. This price was arrived at on the basis of $175,000 for Keehn and $275,000 for the Hoyt lot. About February 8, 1922, letters were prepared by Keehn, giving Clark and Trainer an exclusive agency for 30 days to sell both properties at a square foot value that would yield the aggregate price hereinabove mentioned. This writing expired by its terms March 8. Trainer sought an extension saying that his purchaser was interested but was having difficulty in financing the sale.

About March 1, 1922, which was shortly before the expiration of the option of February 8, Keehn went to New York, talked with Kobler, and for the first time learned that Kobler had not agreed to purchase the Blair lot, as was represented to Keehn by Dickson. He thereupon returned to Chicago and heard that Hoyt was threatening to repudiate the lease and option because of what he then considered the inadequacy of the option price in the lease.

Because of the new developments thus brought to his attention, Keehn, according to his testimony, became uneasy because he had agreed to deliver the Hoyt lot along with his own and he feared that he might not be able to fulfil this agreement, if Hoyt or those whom he represented should set aside the lease

and option, or if complainants were unable to take up the option. He therefore had a conference with Dunlap and told him what he had learned from Kobler in New York, as well as what he had heard as to Hoyt's threats to withdraw from the lease and option. Dunlap admitted that Hoyt was "going to give him trouble," but he "thought it would go through all right." Keehn testified that he told Dunlap it was important for him to know, because if he was contracting with third parties to deliver property on which Dunlap and Dickson had only an option to purchase and it developed that Hoyt would not go through with the deal, he would find himself in a very embarrassing position. He thereupon suggested to Dunlap that he exercise the option on the Hoyt property and thus eliminate the existing contingency. Dunlap replied that he and Dickson could not exercise their option because they did not have the money and according to Keehn's testimony, Dunlap then informed Keehn "that is what we have got you in the deal for." Dunlap further suggested that Keehn would have to advance the money for the option on the Hoyt lot besides taking care of his own property. Keehn replied that this was not his understanding and he would not do so; that he would work with them to sell the two properties but could not again agree to sell as one piece; that he would be willing to modify the contract to that extent or cancel it; that he felt friendly and wanted to go along as much as he could; that he considered the property was worth more than they were asking for it, $450,000; that in order to help he would modify the contract to the extent that he, Keehn, would take care of his own property and they could take care of theirs; that he would work with them to sell the two properties, but that any sale of his property would have to bring him, Keehn, $200,000.

According to Keehn, Dunlap then insisted that Keehn would have to finance the complainants' end

"or the contract would have to be cancelled—that they couldn't do and would not do it." Thereupon according to Keehn's testimony, he told Dunlap, "I told them that if the provision I suggested wasn't accepted, that we would have to cancel the contract and follow that up by a written statement to that effect." This conference between Keehn and Dunlap is denied in every particular by Dunlap. It appears from the evidence, however, that Keehn told Trainer of his conversation with Dunlap several days after it is alleged to have taken place. This is corroborated by Trainer and also by events that occurred immediately thereafter.

When the 30-day option of February 8, expired, Keehn declined to sign a further joint option. Trainer therefore procured for Hunt separate options expiring April 1, one from complainants to purchase the Hoyt lot for $275,000 and another from Keehn to purchase the Blair lot for $200,000.

About March 18, Trainer told Keehn that he could not sell the two properties for $475,000. He handed Keehn back his option. Keehn said "all right, that is satisfactory to me" and tore up the option. Defendant contends that when Trainer procured the joint option February 8, on both properties at $450,000, he set out to beat down the price and that the application for the extension on the ground that Hunt was unable to procure the necessary capital was merely the first step toward that end. Dunlap and Dickson had agreed with Keehn to demand $450,000 for the two properties. When the option of February 8, expired Keehn, in keeping with the provisions of paragraph 8 of the contract "that each party should at all times endeavor to promote the sale of the properties at the best possible price obtainable" raised the price upon his own lot $25,000, and when Trainer came to him on March 18 and told him he could not consummate the deal at the option price Keehn showed no disposition to make

any reduction. Dunlap and Dickson, however, indicated a willingness to accept $400,000 for the two properties, which was considerably less than the price agreed upon between complainants and Keehn. It appears from the evidence that Dunlap, instead of presenting these figures to Keehn, as provided in their contract, entered into negotiations with Trainer for a reduction in the price. He told Trainer to get a buyer at $400,000 and he believed Keehn would agree to the sale. Defendant insists that this conduct on the part of Dunlap and Dickson was, in and of itself, a sufficient violation of the agreement with Keehn to justify the latter's withdrawal therefrom.

Keehn testified that he realized at this time the futility of trying to negotiate a sale for the two properties while Dunlap was cutting the price, and accordingly on March 25, he addressed a communication to Dunlap and Dickson complaining of the situation. He said, among other things:

"It is very evident on account of the failure of the Trainer deal for our Michigan and Illinois property that our joint agreement relative to a joint sale is interfering with that sale. . . .

I do not want to stand in the way of a possible sale of your property by you gentlemen.

I would like to sit down with you the first of the week and talk the thing out. Maybe we can reach a better basis. . . ."

Dunlap and Dickson made no reply to this communication.

On March 28, Keehn again wrote complainants, saying:

"On account of the fact that it seems impossible to negotiate in a deal by acting together under the terms of the contract, I hereby elect to cancel.

I think both parties can succeed very much better independently and then there can be no question about the right to negotiate. . . .

I think it only fair, therefore, that you should be relieved of any responsibilities under our joint contract so that you might feel free to negotiate as you see fit."

About this time Dickson and Dunlap consulted counsel, were advised that their contract with Keehn was valid and that Keehn could not cancel without their consent. They thereupon addressed the following letter, dated March 30, to Keehn:

"Dear Mr. Keehn:

We have your letter of March 28, 1922, in which you say you elect to cancel our contract.

We know of no reason why the contract should be cancelled nor of any right on your part to cancel it.

What have you in mind?

Sincerely"

On March 31, Keehn replied thereto as follows:

"The contract provides that all parties shall use their best efforts to make a joint sale of the property. I have worked diligently but I do not believe you have done as much. . . .

Any party to a contract can cancel it any time he sees fit, providing he is willing to stand the consequences."

No reply was made by complainants to Keehn's last communication, but Dunlap immediately called on Keehn, who advised the former that "he had consulted a high legal authority on the contract and that it was void." Keehn testified that Dunlap did not then tell him that he and Dickson objected to the cancellation of the contract or that they intended to bind him thereto.

On April 6, Dunlap saw Trainer who told him that he had Hunt's earnest money check for $40,000 and was willing to purchase the two properties at $400,000. Dunlap, however, did not call on Dickson or Keehn to ascertain whether they would accept this price or

submit the figure, as provided in the contract, nor did he make any effort to get a better price from Trainer. He directed Trainer to prepare two separate contracts, one for $241,666 for Dickson and himself and one for $158,333 for Keehn, and stated that he believed Keehn could be induced to sign such a contract.

That same evening Keehn called Dunlap on the telephone, saying Trainer had just called him and inquired if Dunlap knew what Trainer wanted. Dunlap advised Keehn that he had just left Trainer, who had made Hunt's offer of $400,000 known to him and that Trainer would have a check for $40,000 earnest money the next morning. According to Dunlap's testimony Keehn then said, ''Well, if we are working under the old contract or under the contract or under our contract, I suppose that I have a right to buy your property at that figure,'' and that he (Dunlap) replied, ''I told him that was a fact, if he wanted it, he could have it. I told him that I never believed that he meant to cancel our contract anyway.''

That same evening Trainer met Keehn at the South Shore Country Club and told him of his conversation with Dunlap and of Hunt's offer. Keehn replied that his price was $200,000, saying, according to Trainer's testimony, ''if we could bring a buyer for $200,000 he would sell; he would not sign a joint contract.'' Dunlap testified that Keehn called him the next morning stating he had talked to Trainer and that ''he did not think Trainer had a buyer,'' but ''he wanted to state that as far as being in earnest in cancelling the contract, that he was never more in earnest in his life.'' Dunlap replied that he thought Trainer would show up with a contract and the money, but said nothing of his intention to hold Keehn to the agreement. Trainer testified that he had called Dunlap twice during the same day stating that he would be over later. He also notified Keehn, who according to his testimony

said, "well go ahead and talk to them and make the best deal you can and let me know."

About four o'clock the same day, April 7, Milton and W. O. Trainer came to Dunlap's office with a joint contract for $400,000 covering both properties. Dunlap told them he knew Keehn would not sign a joint contract; that the only way to get him to accept the proposition was to make separate contracts. The next morning, April 8, Trainer went to Dunlap's office. Dunlap told him "Keehn was up in the air"; that he, Trainer, "had spoiled the situation by talking with Keehn"; that he should have taken his (Dunlap's) "instructions and worked along with him; that he would have gotten it signed, but now Keehn would not act."

About six o'clock on April 8, the two Trainers went to Keehn's office and tendered him the $400,000 contract, which had been signed by Hunt. Keehn told them he would not sign. He said he was going to California. Trainer drew a separate contract at a price of $200,000 for the Blair lot, caught Keehn at the railroad station, and induced him to sign. The time was short and Keehn signed the contract without reading it. He asked Trainer, however, if the contract contained a clause that his title would not pass unless they could make a satisfactory deal with Dunlap and Dickson, and Trainer assured him there was. The agreement signed by Keehn provided for the purchase of the Blair lot by Hunt for $200,000. It recited that Hunt was simultaneously entering into contracts of purchase with the owners of lot 2, which was the Hoyt property, and with the owners of other property in the block, and provided that if "the owners of any of the tracts, the purchase of which is herein contemplated, fail or refuse to execute or deliver contracts of purchase within five days, this contract shall at the option of the purchaser (Hunt) . . . become null and void."

On Monday, April 10, the two Trainers saw Dunlap in the latter's office and told him that Keehn had signed the contract for $200,000, that there was left only $200,000 for the purchase of the other property, and asked whether Dunlap and Dickson would sign the agreement. Dunlap stated that he wanted to talk with his attorney and did not know what he and Dickson would do. Dunlap testified that when the Trainers showed him Keehn's contract for $200,000 and assured him that $400,000 was all that Hunt would give, "it was a matter of taking or leaving it"; that Dickson and he then talked the matter over for a while and thought the best thing to do was to accept it, that is, to accept Keehn's contract on account and take the other $200,000. "I told Trainer we would accept the $200,000 and apply Keehn's contract on the account—on account of the $200,000."

In the presence of Dunlap's counsel it was explained that Hunt was interested in acquiring the whole of the block and that the success of the conclusion of the contract was dependent on all of the titles to the property being good; that if the title to one parcel failed, the contract would fail in the entire block, unless Hunt elected to take such title. Dunlap's counsel insisted that Hunt agree to provide the $40,000 necessary for Dunlap and Dickson to exercise their option and this was arranged. That same evening Dunlap telegraphed Keehn as follows:

"In full compromise of all differences between Dickson you and me we will sign contract and close deal as offered by Trainer if you will wire your assurance that you will turn over to us twenty-five thousand out of your two hundred thousand Do not tell me to go to hell on your wedding day"

Before they received a reply to this telegram Dunlap and Dickson executed the contract with Hunt at a purchase price of $200,000. Upon receipt of the telegram Keehn wired as follows:

"Wouldn't tell you that on this day or any other day I am for you now as I always have been but those buyers must pay you and John the extra you demand Good luck."

Hoyt, as anticipated, had some doubt about the advisability of going through with his lease and option to Dickson and Dunlap. At the suggestion of Dunlap's counsel Trainer went to see him and Hoyt stated that he thought he was making a mistake; that if he were trustee for any one else than his own daughter someone might criticise him very severely. He finally settled, however, for an additional $1,700.

April 29 Keehn returned to Chicago and on the following day he learned for the first time that complainants had signed a contract for a price which they considered unsatisfactory and had employed counsel to file suit against him. On May 1 he wired Dunlap, who was then in New York, that he had just learned of Dunlap's and Dickson's dissatisfaction with the contract signed by them and stated "my agreement (with Hunt) was based absolutely upon buyer's ability to get a contract with you. If the price you are to receive under your individual contract is not satisfactory, then withdraw from the deal if you can, as I do not think you have any recourse otherwise, etc. I wanted to be at all times friendly and still want to help you protect yourselves if you can, but wire me your position so that I may see if there is any possible way I can help you." Neither Dickson nor Dunlap replied to this telegram, although there was still time to set the transaction aside, as Keehn's deed to the Blair lot was not executed until May 9, and complainants' notice to Hoyt of their election to purchase was not given until May 13, and the deal with Hunt was not closed until some time in June. The bill of complaint herein was filed December 21, 1922.

The chancellor, as heretofore stated, dismissed the bill of complaint upon the ground that the provisions

of paragraphs 9 and 11 of the contract were in violation of the rule against perpetuities and in restraint of alienation, and therefore rendered the entire agreement invalid on grounds of public policy. However, we regard the facts as of paramount importance and shall therefore first consider the other contentions of counsel.

It is first urged that complainants are in court with unclean hands. This contention is based on the alleged misrepresentations of complainants and their failure to divulge the facts fully, first to Hoyt in acquiring the lease and option, then to Hearst in procuring his consent to the assignment thereof, and lastly, in their dealings with Keehn, whereby he was induced to acquire the Blair lot and enter into the joint venture with complainants for the disposition of the combined properties. The chancellor dismissed these considerations as being of no consequence. In so doing he evidently believed that, in view of his conclusions as to the invalidity of the contract on legal grounds, the facts were of secondary importance.

Complainants learned of the Hoyt property in looking for available advertising space on behalf of the Publishing Company. As its confidential employees and realizing fully the value of this lease as an asset to their employer, it was their duty to acquire the leasehold for the company, not for themselves. Had Hoyt consented to make the lease to Dickson and Dunlap personally, as they first suggested, it would clearly have been a violation of their duty to the Publishing Company, for which the latter could have maintained a suit in equity against complainants as constructive trustees to recover the property. (*Davis v. Hamlin,* 108 Ill. 39.) As a matter of necessity, however, complainants took the lease and option in the name of the Publishing Company, with the avowed purpose of having it assigned to them if Hearst's consent could be obtained. This was accomplished by means of the

letter heretofore set forth, which is significant chiefly because of the important information withheld from their employer. With full knowledge of the fact that the Hoyt property could be made to yield a profit probably in excess of $20,000 annually for advertising space alone and that real estate values on Michigan avenue were rapidly enhancing, Dunlap and Dickson withheld these salient facts from Hearst, to whom they owed the duty of fidelity as his employees. It is difficult to believe that Hearst would have given his consent to the assignment if all the facts had been made known to him. Under the circumstances he could clearly have maintained a suit in equity to recover the property from complainants, even though their title was obtained through an assignment to them instead of by a direct purchase. (*Tyler v. Sanborn,* 128 Ill. 136; *Fox v. Simons,* 251 Ill. 316; *Stemm v. Gavin,* 255 Ill. 480.)

In that situation complainants' title would have been quite insecure, and this fact is significant when taken in connection with the negotiations resulting in the acquisition of the Blair lot by Keehn. Dickson withheld from Keehn the significant facts that he and Dunlap had tried to get the property personally for themselves and that the lot would yield a net profit annually in excess of $20,000 for advertising space. Neither did he disclose to Keehn the details by which Hearst had been induced to give his consent to the assignment. Keehn was entitled to have all of this information, not only in his capacity as president of the Publishing Company, attorney and confidential representative of Hearst, but also for the protection of his interest in acquiring the Blair lot. This lot standing alone, located in back of the Hoyt lot, 20 feet below the surface of the street and with no access to Michigan avenue, was valuable to Keehn only when taken in connection with the Hoyt lot. Therefore, it

was extremely important to Keehn to have all the information then in the possession of complainants. Just as Hearst would probably have withheld his consent to the assignment if all the facts had been made known to him, so also Keehn would in all likelihood have refused to invest $100,000 in the Blair lot if he had known the facts from which, as a lawyer, he could have ascertained the insecurity of complainants' title. Moreover, it is extremely unlikely that Keehn, as president of the Publishing Company and Hearst's confidential employee, would have executed the assignment as president, had he known all the facts, without first insisting that a full disclosure as to the value of the Hoyt property be made to Hearst. Manifestly, full frankness on the part of complainants toward Keehn would have defeated the entire plan and probably have resulted in a return of the Hoyt property to the Publishing Company.

The immediate subject matter of this entire transaction was the Hoyt lot. Its acquisition was the keystone of the plan by which the parties hoped to dispose of the combined properties and thus reap considerable profits for themselves. Therefore the negotiations with Hoyt and certainly the concealments from Hearst and Keehn of salient facts, which if disclosed would have defeated the accomplishment of complainants' plans, tainted the entire transaction so as to preclude recovery in a court of equity in favor of those who seek the court's aid.

It is stated in Pomeroy's Equity, 4th ed. paragraph 401, that:

"Whatever be the nature of the plaintiff's claim and of the relief which he seeks, if his claim grows out of or depends upon, or is inseparably connected with, his own prior fraud, a court of equity will, in general, deny him any relief, and will leave him to whatever remedies and defenses at law he may have."

This rule is supported by *Miller v. Kraus* (Cal. App.), 155 Pac. 834, in which the doctrine of unclean hands was invoked by the court to defeat the rights of the complainant who sought an accounting under a copartnership agreement where his own conduct was characterized by the court as unconscionable. The court said:

"As is plainly manifest from the findings, a copartnership between the plaintiff and the defendant was established or brought into existence through fraud practiced by the former upon the latter, and certainly the plaintiff is in no position to ask the favor of equity as to a transaction thus brought about by him.

" 'Whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.' 1 Pom. Eq. Juris. § 397.

"Partnership contracts create a fiduciary relation between the partners and they must be founded in good faith and upon the consent of the parties and for a lawful purpose. And it is a settled as well as a most salutary rule that where one of the parties to an agreement of partnership has been induced to enter into it by the fraudulent representations of the other, the partnership may be declared void and dissolved, or, what in effect amounts to the same thing, the agreement of partnership rescinded. 30 Cyc. of Law, p. 657; Story on Partnership, § 6; *Hynes v. Stewart & Owens,* 49 Ky. (10 B. Mon.) 419. This rule proceeds from the theory, of course, that where one partner is induced by the fraudulent representations of the other to enter into the partnership the consent of the former to the agreement has not been obtained."

Conduct similar to that of complainants was likewise condemned by the Supreme Court of this State in *Dunning v. Bathrick,* 41 Ill. 425. In that case a farmer named Darling owned a tract of land. The complainant Bathrick and others conspired to obtain this property from Darling. The defendant Dunning carried on an opposing conspiracy. Dunning and his associates were successful in obtaining possession of the land by means of false representations and various other frauds upon Darling. Bathrick filed a bill in equity seeking to hold Dunning as trustee. The court denied him the relief prayed for on the ground that complainant had come into court with unclean hands, saying:

"Here, then, is shown falsehood, deceit and misrepresentation of the most aggravated character, out of which no good claim can arise to demand the aid of a court of equity. Equity delights not in iniquity, but repels from her embrace all who practice it. . . . Such hypocrisy, baseless pretensions and mock benevolence, cannot stand the test of the most ordinary scrutiny and they place the complainant in a situation far from enviable. . . . All his acts are marked by this one overpowering desire to obtain this land; and by fraud and misrepresentation, he has got a deed for it. The defendants have a deed also and are in possession. And though the proceedings under which they claim title may be denounced as having originated in forgery, and carried on by fraud, still in such a contest where there is knavery on both sides, which shall this court aid?

"Here was a contest, who should steal this land. The complainant approaches a court of equity, holding in his hand evidence of his attempt to get this land from Darling by a purchase for taxes, and the deed Darling executed, for which he has never received a dollar. Here, then, is no remarkable equity on com-

plainant's part by his own showing. The defendants' case seems to us to be full of fraud of the blackest dye, and can find no favor with this court. Which of these parties, both with unclean hands, should a court of equity assist? Justice, and those pure principles which are the ornament of such a court—its brightest jewels—answer, neither.

"We cite no authorities in support of the conclusion we have reached. Books need not be searched for precedent. It is found inborn, innate in every bosom. Where both parties seek a right through fraudulent devices and pretenses, neither party can have the aid of a court of equity.

"On a bill filed by the heirs at law of Darling, no obstacle appears to their recovery."

Defendant further insists that there was an anticipatory breach of the contract on the part of Dunlap which justified Keehn in terminating the agreement. This contention is based upon a conversation testified to by Keehn with Dunlap following Keehn's return from New York just before the expiration of the joint 30-day option, dated February 8, 1922. Keehn testified that he told Dunlap what he had heard from Kobler, and discussed with Dunlap the possibility of Hoyt's repudiation of the lease and option to complainants. Keehn insists that he pointed out to Dunlap the embarrassing position in which he would find himself if it developed that Hoyt would not go through with the deal because he, Keehn, would then be bound under the joint option to deliver title not only to his own property but also to the Hoyt tract, which he did not own. After telling Dunlap that he could not be put in such a position, Keehn asked Dunlap why he did not exercise the option, acquire the property, and thus eliminate the existing contingency. In reply to this inquiry Dunlap said, acording to Keehn, "well, we cannot exercise the option, that is what we have got

you in the deal for; we have to put up $40,000 to exercise the option, we though the thing would carry itself; we did not want to exercise the option until we knew we were able; evidently you have to finance it for us.'' Keehn then stated that this was not his understanding of the contract; that he had to finance his own property and that when the time came complainants would have to give notice, exercise their option and be prepared to deliver title. Dunlap told Keehn that complainants did not so understand the transaction and that Keehn would have to finance it for them or else the contract would have to be canceled because complainants could not and would not do it.

Dunlap denied this entire conversation. Complainants by their brief devote some 50 pages to an argument tending to show that the conversation did not take place and that there was no anticipatory breach. Presumably, if the conversation took place, as related by Keehn, an anticipatory breach was committed by complainants. The authorities are clearly to this effect. (*Kadish v. Young,* 108 Ill. 170; *Lake Shore & M. S. Ry. Co. v. Richards,* 152 Ill. 59; *Chicago Title & Trust Co. v. Sapola Lumber Co.,* 242 Ill. 468; 15 R. C. L. 506, 507.)

Keehn's version of this conference with Dunlap is supported by the logic of events that followed, as well as by the testimony of Trainer, Case, Hunt and Fleming. It clearly appears from the evidence that complainants were unable to put up the money with which to exercise their option, and that when the Hoyt property was finally sold to Hunt, the latter had to advance the $40,000 required to exercise the option, as well as the purchase price. It also appears from the evidence that the rumor regarding Hoyt's threatened refusal to sell the property because of the inadequacy of the price was well founded. Several witnesses testified to this fact, including Trainer and Dunlap himself,

who stated, ''I say Hoyt wanted twelve or fifteen thousand. At one time I think he wanted twelve or fifteen thousand—was it seventeen thousand—he wanted that because he maintained that as trustee he did not have the right to accept that money all in cash when he had a good investment for it on the original term of the option. . . .'' And the record shows that complainants finally paid Hoyt an additional $1,700 to satisfy his anxiety. As against these circumstances there is Dunlap's denial of the conversation. From an examination of the record, however, it appears reasonable to conclude that Keehn's version of the conference with Dunlap is substantially correct. He followed this conversation with letters notifying complainants of his intent to cancel the agreement and his conduct thereafter was fully consistent with the position assumed by him.

A considerable portion of the briefs is devoted to a discussion of the law relative to the validity of the contract between complainants and Keehn, and also to a discussion of the question whether a fiduciary relationship existed between Keehn and complainants, which would operate as an estoppel against Keehn to deny the validity of the contract. In view of our conclusion as to the facts of the case, however, we deem it unnecessary to protract this already lengthy opinion with a discussion of these legal questions. It may be said in passing that these parties were dealing at arm's length; that they were all employees of Hearst, occupying responsible positions, and that no confidential relationship existed between them. The theory underlying complainants' contention that Keehn is estopped from denying the validity of the contract is based upon an assumption, not evidence, that Keehn knew clauses 9 and 11 would render the contract void. The fallacy of this argument is evident from the fact that Keehn had invested $100,000 in the Blair lot in reliance upon the existence of the contract,

and would, therefore, have been foolhardy, to say the least, in executing an invalid agreement which might have resulted in a failure of the plan to sell the combined properties as one and left him holding a piece of land purchased at great cost with only moderate chances of recovering the capital that he had invested therein.

For the reasons stated, the decree of the superior court dismissing the bill for want of equity will be affirmed.

*Affirmed.*

HEBEL, P. J., and WILSON, J., concur.